DAVID FRANCIS COLE, an Infant, by Guardian, Plaintiff, *v.* THE ROME SAVINGS BANK and C. ROBERT EDWARDS, Defendants.

(Supreme Court, Oneida Special Term, March, 1916.*)

Partnership — what constitutes—lease of real property — who are creditors — negligence — mortgages — landlord and tenant.
Negligence — evidence — action to recover for injuries — verdict — when motion to set aside verdict denied.

It is well settled that in order to constitute a partnership *inter sese* the party sought to be charged must have a proprietary interest in the business in question.

To make one a partner he must be entitled to share in the profits and be liable for the losses the same as the other member

---

* Received too late for insertion in proper place.— [REPR.

of the firm; if he has no such proprietary interest, or, while he is entitled to share in the profits, such sharing is by way of compensation only for services, no partnership relation is created.

Where a lease of real property reserves to the landlord a certain portion of the net profits as compensation for the use of the premises no partnership relation exists between the parties.

While in certain cases parties may be held to be partners as to creditors upon the ground that by participating in the profits of a business they take that which should be devoted to the payment of claims that arise in the business, the party must have a proprietary interest in the profits as such and not merely as a means of compensation.

Where a bank, having bid in a certain theatre property at a foreclosure sale under a mortgage held by it, leased the premises with reservation of a certain portion of the profits as rental, all necessary repairs to be made from the income, and the parties did not intend a joint business undertaking in which each had a proprietary interest, there was no partnership *inter sese*.

Upon a demise of real estate there is no implied warranty that the premises are fit for occupancy or suitable for the purposes for which they are leased.

During an exhibition given in the theatre a member of a troupe of acrobats engaged by the lessee fell into a casting net placed in position under a trapeze and one of the hooks which held the guy cable in the rear tore through the floor breaking a " V " shaped iron cover and the cable about two feet from the hook with the result that both were hurled into the auditorium and struck and severely injured a spectator. An examination made after the accident disclosed that the " V " shaped iron under which the strain of the hook came was broken in two and that the hook had torn through the floor leaving a hole about four inches long and five-eighths of an inch wide. Some of the witnesses described the wood at this place as being somewhat brittle. Others testified that the wood was sound at this place, but no evidence was given as to the condition of the breaks in the iron plate and cable. Some evidence was also given that in setting up casting nets in other places the floor where the hooks were attached would at times be reinforced by an extra board underneath the hole and also that the hooks fastened to guy cables would be attached to eye bolts screwed

Supreme Court, March, 1916.    [Vol. 96.

through the floor into the joists beneath. In an action to recover for the injuries to the spectator it was held at the trial that the evidence was not sufficient to sustain a recovery against the bank and, as plaintiff did not desire any recovery against the lessee of the theatre alone, a verdict was directed in favor of both the lessee and the bank which had been made a party defendant. On motion to set aside the verdict and for a new trial, held, that a fair question of fact was presented as to whether the troupe of acrobats engaged by the lessee to give the exhibition used due care in the erection and securing of the casting net, and as it was the business of the lessee and not that of said troupe the relation of *respondeat superior* existed and the lessee was chargeable with the negligence of the acrobats, and the motion should be denied.

MOTION to set aside a verdict directed for defendants and for a new trial.

William E. Scripture, for motion.

Oswald P. Backus, opposed.

EMERSON, J. The Rome Savings Bank took a mortgage in the year 1907 upon the Lyric Theatre, so called, in the city of Rome, which was afterward foreclosed and the property bid in by the bank, the referee's deed bearing date February 28, 1912. On March 1, 1912, said bank entered into an agreement in writing with one C. Robert Edwards, which recited that it was a lease made between the bank as party of the first part and Edwards as party of the second part whereby, in consideration of the rents and covenants therein expressed, the party of the first part demised and leased said Lyric Theatre property to party of the second part for the term of one year from the date thereof.

Party of second part agreed that he would care for and manage said property and conduct the same as a

theatre property and for no other purpose except with the consent of the lessor. That he would keep books of account containing all receipts and expenditures incident to the operation of said business and property and would allow a representative of the lessor at all times access to said books and an examination of the same and that he would furnish to the lessor monthly statements of all receipts, expenditures and liabilities created. That he would during the continuance of said term first deduct from the receipts $100 per month, to be applied to his own uses and from the balance pay for insurance upon the buildings and personal property not to exceed $950 per annum. Also all taxes against the property, the cost of theatre license, necessary advertising, the orchestra and all labor employed and all expenses incident to operating said theatre, including repairs and necessary replacements to keep the building and property in as good condition as it then was, and should pay to the lessor the sum of $1,600 per year, and at the termination of the lease one-half of the surplus profits, if there should be a surplus after making the above payment, the other half of said surplus to be retained by and belong to said lessee. Also, that if, upon the termination of said lease, the net receipts should prove insufficient to make the payments aforesaid, the entire net receipts should be paid to the lessor, less $100 per month to be retained by the lessee.

The agreement further provided that the lessee should have the option to purchase said property at any time during the period covered by the lease for the sum of $32,000 in addition to said sum of $1,600 or so much thereof as shall have accrued, and less any sum that may have been received over and above said sum of $1,600. Also, that, if party of second part failed to perform any of the covenants therein contained.

party of first part might re-enter or resort to any legal remedy. Said party of second part further covenanted that at the expiration of said lease he would surrender said premises to party of first part in as good condition as they then were, necessary wear and damage by the elements excepted.

Thereafter Edwards conducted the theatre for amusement purposes and engaged a troupe of acrobats known as the "Four Campbells" to give acrobatic exhibitions in the same. This troupe came there about April 25, 1912, bringing with them the apparatus connected with their exhibition, including bars, trapezes and casting nets required by law, and the apparatus for setting them up and securing the same. These performers set up the bars and trapeze and underneath placed the casting net in position. This net was about twenty-five feet long and seven feet wide and was raised about two and one-half feet above the stage floor and was fastened at the ends and sides to iron bars which were held in position by iron posts running to the floor which were in turn steadied and held in position by three guy cables on each side fastened to the structure and about seven feet long which ran down to the floor and were attached to hooks which were caught under the floor in holes made for that purpose. On top of the floor and on the inside of these holes a "V" shaped piece of iron was screwed down under which the strain from the hook and guy cable came. The stage itself was about sixty by forty feet in size and along the front part where the trapeze was erected there were from 150 to 200 holes ranging from five-eighths to three-quarters of an inch in size which had been bored in the floor for acrobatic exhibitions. These holes in places were quite close together and in some instances had been plugged up for that reason.

The Four Campbells gave their first exhibition on

Thursday, April twenty-fifth, and on Saturday, April twenty-seventh, during a performance, one of the performers fell in the net and one of the hooks which held a guy cable in the rear tore through the floor breaking the " V " shaped iron cover and also breaking the cable about two feet from the hook, with the result that the hook with this piece of cable attached was hurled into the auditorium and struck the plaintiff, who was witnessing the performance, on his head, fracturing and depressing his skull and causing very severe injuries. An examination made after the accident disclosed that the " V " shaped iron under which the strain of the hook came was broken in two and that the hook had torn through the floor leaving a hole about four inches long and five-eighths of an inch wide. Some of the witnesses described the wood at this place as being somewhat brittle. Others testify that the wood was sound at this place, but no evidence was given as to the condition of the breaks in the iron plate and cable. Some evidence was also given that in setting up casting nets in other places the floor where the hooks were attached would at times be reinforced by an extra board underneath the hole, and also that the hooks fastened to guy cables would be attached to eye bolts screwed through the floor into the joists beneath.

The plaintiff brought this action, alleging that his injuries were caused by the negligence of Edwards and the Rome Savings Bank, and on the trial it was held that there was not sufficient evidence to sustain a recovery against the bank. The plaintiff did not desire any recovery against Edwards alone and for that reason, on the motion of defendant's counsel, a verdict was directed in favor of both defendants which plaintiff now asks to set aside, and for a new trial.

I think, upon the evidence in the case, a fair ques-

13

tion of fact was presented as to whether the Campbell
Brothers used due care in the erection and securing of
the casting net and, as they were hired to give the exhi-
bition from which the proprietor derived profit, it was
the business of the proprietor and not that of Camp-
bell Brothers. The relation of *respondeat superior,*
therefore, existed and the proprietor was chargeable
with their negligence.

It is claimed by the plaintiff that there was a part-
nership between the Rome Savings Bank and Edwards
in the management of this theatre and that, there-
fore, the bank, as well as Edwards, is chargeable with
the negligence of the Campbell Brothers. Unless there
was a partnership it is clear that the bank would not
be so chargeable, as in that event they did not hire
Campbell Brothers and had no control over them, and
hence the relation of *respondeat superior* did not exist
between them. *Blackwell* v. *Wiswall,* 24 Barb. 355;
*Maxmilan* v. *Mayor,* 62 N. Y. 160, 163; *King* v. *New
York C. & H. R. R. R. Co.,* 66 id. 181, 184; *Wyllie* v.
*Palmer,* 137 id. 248, 257; *Higgins* v. *Western Union
Tel. Co.,* 156 id. 75, 80; *Butler* v. *Townsend,* 126 id. 105.

The important question, therefore, is whether the
partnership relation existed between the parties. It
is well settled that in order to constitute a partnership
*inter sese* the party sought to be charged must have a
proprietary interest in the business in question. He
must be entitled to share in the profits and be liable
for the losses the same as the other members in the
copartnership. If he has no such proprietary interest,
or, while he is entitled to share in the profits, such
sharing is by way of compensation only for services,
such a relation is not created. *Chase* v. *Barrett,*
4 Paige, 148, 160; *Leggett* v. *Hyde,* 58 N. Y. 278, 279;
*Cassidy* v. *Hall,* 97 id. 160; *Hackett* v. *Stanley,* 115
id. 630.

Nor does such a partnership relation exist between the parties where there is a lease of real property reserving to the owner a certain portion of the net profits as compensation for such use. 3 Kent's Com. 33; *Perrine* v. *Hankinson,* 6 Halst. (N. J. L.) 215; *Catskill Bank* v. *Grey,* 14 Barb. 476.

But notwithstanding there may be no partnership in fact, yet the parties may in certain cases be held to be such as to creditors upon the ground that by participating in the profits they take that which should be devoted to the payment of claims that arise in the business. 3 Kent's Com. 25; *Manhattan Brass & Mfg. Co.* v. *Sears,* 45 N. Y. 797, 799; *Leggett* v. *Hyde,* 58 id. 279; *Burnett* v. *Snyder,* 76 id. 351.

In such a case, however, the party must have a proprietary interest in the profits as such and not merely as a means of compensation. *Leggett* v. *Hyde,* 58 N. Y. 272; *Eager* v. *Crawford,* 76 id. 97, 101; *Curry* v. *Fowler,* 87 id. 33; *Richardson* v. *Hughitt,* 76 id. 55, 58; *Cassidy* v. *Hall,* 97 id. 160, 168, 169; *Hackett* v. *Stanley,* 115 id. 629, 630.

The distinction between a partnership *inter sese* and one which is held to exist as to third persons who are creditors is well illustrated in *Catskill Bank* v. *Gray, supra.* In that case the Ulster Iron Company leased to Gray its plant for the manufacture of iron and as rent Gray stipulated to pay one-fourth of the net profits. Gray was to furnish all capital necessary to carry on the business and was to expend in machinery and improvements not to exceed $5,000 for which he was to be allowed interest until the rent accruing should equal the expenditure. Any loss was to be charged to profit and loss account, but the company was not to be liable for any deficiency at the end of the demised term. The one-fourth profits to be paid as rent was to be paid one-half annually and the bal-

ance at end of term with interest, and Gray was to be allowed interest on all moneys he put in the business and allow interest on all moneys he received in the same. The superintendent of the iron company, acting also for Gray, made loans of the Catskill Bank by drafts drawn by him as superintendent of the iron company upon Gray, the lessee, and accepted by him, the proceeds of which were used by Gray in carrying on the business. The court refused to hold that there was a partnership *inter sese,* but did hold that the iron company had an interest in the profits as such and was, therefore, to be held liable as a partner to the bank, which was a creditor of the business (14 Barb. 478); so also in *Hackett* v. *Stanley,* where the defendant made a loan to another for use in his business and was to advance further sums and perform services in the business upon an agreement that any money either should advance should draw interest, the party conducting the same to have stated salary and make monthly reports to defendant, the net profits to be equally divided, it was held that, notwithstanding there might not be a partnership between the individuals, there was such a partnership as to the plaintiffs who were creditors of the business. 115 N. Y. 629, 631.

I think, before the bank can be held liable for the acts of the Campbell Brothers or Edwards, a partnership *inter sese* must be established between the parties. As the bank itself did not commit any negligent act it can only be held liable for the acts of others on the ground that the relation of *respondeat superior* existed between it and the party that did the wrongful act. In other words, that such a relation of principal and agent or master and servant existed that gave the bank control over and a right to regulate their acts and conduct. *Blackwell* v. *Wiswall, supra; McGuire* v.

*Grant,* 25 N. J. L. 357; 1 Thomp. Neg., § 578; 29 Cyc. 477; 31 id. 1219.

The plaintiff was not a creditor of the business, as his claim did not arise out of the business itself, but rather out of a tort in carrying on the same, and hence the rule which makes a party who takes part of the profits liable to the creditors has no application. Neither was the plaintiff in any manner misled by the way in which the business was conducted so as to hold the bank for the acts of others on the ground of estoppel. There must, therefore, be a partnership in fact established from which, on the theory of agency of each party, the rule of *respondeat superior* arises.

The case of *Heimstreet* v. *Howland,* 5 Den. 68, would seem to fully support the above proposition. See, also, *Fiske* v. *Framingham Mfg. Co.,* 14 Pick. 491; 1 Thomp. Neg., §§ 519, 580; *Wakeld* v. *Elkins,* 1 Starkie N. P. 272; 30 Cyc. 383.

Coming now to the contract relations existing between the bank and Edwards, it must first be borne in mind that an actual intention is requisite to constitute a partnership *inter sese* (3 Kent's Com. 25; *Salter* v. *Ham,* 31 N. Y. 321; *Heye* v. *Tilford,* 2 App. Div. 350; *Schultz* v. *Brackett Bridge Co.,* 35 Misc. Rep. 595, 597), and whether there was such an intention must be determined from the agreement that they made, which being neither ambiguous nor uncertain, the question of its interpretation is one of law for the court. *Dwight* v. *Germania Life Ins. Co.,* 103 N. Y. 342; *Jones* v. *Gould,* 123 App. Div. 236, 242; *McNally* v. *Georgia-Florida Lumber Co.,* 146 id. 456.

In determining this intention we must bear in mind that such a partnership as is claimed would, without doubt, be *ultra vires* and void as to the bank. Doubtless, as incidental to its ownership, it had the power to lease the property and thus obtain some revenue

therefrom, as a corporation possesses such incidental powers as are reasonably necessary to enable it to perform its corporate function. *Gause* v. *Commonwealth Trust Co.,* 196 N. Y. 134, 144. I do not, however, think that engaging in the theatrical business was the exercise of a power which was reasonably incidental to such ownership and it would, therefore, be *ultra vires* and void. Gen. Corp. Law, § 10; Savings Bank Law, §§ 146, 147, 152; *Nassau Bank* v. *Jones,* 95 N. Y. 115; *Jemison* v. *Citizens' Savings Bank,* 122 id. 135; *Appleton* v. *Citizens' Central Natl. Bank,* 190 id. 417; *Gause* v. *Commonwealth Trust Co.,* 196 id. 134, 153. And the presumption is that the parties intended to contract for the performance of lawful acts and not those which would be unlawful. 16 Cyc. 1082; *Willmarth* v. *Crawford,* 10 Wend. 341, 344; *Brown* v. *Brown,* 34 Barb. 533; *Korn* v. *Shedler,* 11 Daly, 234.

The contract made by the parties is in form a leasé and recites a demise of the premises for the term of one year, at the expiration of which term the property was to be returned to the bank in as good condition as it then was, necessary wear and damage by the elements excepted. The lessee was to use the premises for the purpose of the theatre business and for no other purpose without the consent of the lessor. The lessee was to pay taxes, insurance and all necessary repairs and charges out of the income received from the business, and out of the net receipts he was to deduct $100 per month and pay the bank $1,600 per year. If, after making said payments, there were any profits remaining the bank should have half of the same. But if there were not enough receipts to make said payment the lessee was to have $100 per month and the bank should have the balance. The bank reserved no right of entry or oversight over the business, nor was it liable for any losses that might arise in the same and, while it had

the right to inspect the books kept by the lessee, this, in my judgment, was merely to enable it to know the amount of the net receipts. I think the parties did not intend a joint business undertaking in which each had a proprietary interest, but a lease of the premises to Edwards with the reservation of a certain portion of the profits as rental which, as we have seen, is allowable in such cases. *Catskill Bank* v. *Gray,* 14 Barb. 476; *Demarest* v. *Koch,* 129 N. Y. 218; *Heimstreet* v. *Howland, supra; Fiske* v. *Framingham Mfg. Co., supra.*

The remaining question is whether under the general principles of law applicable to lessors and lessees there was any liability on the part of the bank. The general rule is that upon the demise of real estate there is no implied warranty that the premises are fit for occupation or suitable for the purposes for which they are leased. But if the lessor knows the premises are dangerous and unfit for use he is liable on the ground of negligence. So, also, where the premises are in such condition as to create a nuisance at the time of the demise the lessor is liable for damages resulting therefrom. *Edwards* v. *New York & H. R. R. Co.,* 98 N. Y. 245, 249; *Lusk* v. *Peck,* 132 App. Div. 426, 430; *Timlin* v. *Standard Oil Co.,* 126 N. Y. 514. And *Ahern* v. *Steele,* 115 N. Y. 204, where the premises leased consist of buildings or other structures in which public exhibitions and entertainments are designed to be given, for which the lessor in some manner receives compensation, there is an implied obligation on his part that they are reasonably fit and safe for that purpose. *Fox* v. *Buffalo Park,* 21 App. Div. 321, 327; affd., 163 N. Y. 559; *Barrett* v. *Lake Ontario Beach Imp. Co.,* 174 id. 314.

It seems to me there is nothing in this case to show that the building was not reasonably fit and proper for theatrical purposes. The injury in question arose, not

from the condition of the premises, but from the method adopted in staging the entertainment. In all the cases cited where recoveries were sustained the injury resulted from structural defects. In the *Edwards* case a gallery broke down because of overcrowding, and liability was denied by the court. In the *Fox* case a grandstand fell because of insufficient support. In the *Barrett* case the accident resulted from the improper construction of a toboggan slide. In the *Lusk* case a structure erected to witness games of baseball fell because of rotten supports. In the *Connell* case a raised board walk broke down because of rotten supports underneath, and in the *Timlin* case a wall fell over because of its dangerous condition. As before stated, I think this case is distinguishable from those cited in that they all related to structural defects which did not here exist.

I think the action was correctly disposed of at the trial, and the motion to set aside the verdict and for a new trial must be denied.

Motion denied.